25 So.2d 267

## WOODWARD IRON CO. v. EARLEY.

### 6 Div. 400.

Supreme Court of Alabama.

Jan. 17, 1946.

Rehearing Denied March 28, 1946.

Dryer & Dryer, of Birmingham, for appellant.

G. P. Benton, of Fairfield, and McEniry, McEniry, & McEniry, of Bessemer, for appellee.

GARDNER, Chief Justice.

Plaintiff is the owner in fee simple of the surface rights of a tract of land consisting of about half an acre, upon which is situated his dwelling. The location is a few miles from the mining town of Mulga in Jefferson County, Alabama. He moved in 1940 to this particular location, upon which was a well 95 feet in depth, with an abundance of water. In this suit against the Woodward Iron Company plaintiff recovered judgment in the sum of $1500 upon the theory that its mines, under and adjacent to his home, had been negligently operated to such an extent as to cause his well to go dry. From this judgment the defendant prosecutes this appeal.

But few questions are here presented for review. The first is the earnest insistence of counsel for the defendant that it was due the affirmative charge, which was duly requested. There was no damage to the land surface shown in this case, which, under our decisions, would have presented an absolute liability. Our authorities are also to the effect that the mine operator is not liable for incidental damage necessarily occasioned by the ordinary and careful operation of the mine not injurious to the surface, such, for instance, as the loss of wells by the superjacent owner.

Speaking of the loss of water from a well, resulting from mining operations, this Court, in Sloss-Sheffield Steel & Iron Co. v. Wilkes, 236 Ala. 173, 181 So. 276, approvingly quoted in the more recent case of Republic Steel Corp. v. Stracner, 246 Ala. 620, 21 So.2d 690, 692, made the fol-

lowing observation, here applicable: "If defendant is conducting any sort of operations to which its land is adapted in an ordinary and careful manner, and as a consequence percolating water is drained, affecting the surface owner's water supply, either of that or adjoining lands, no liability for his damage exists. But if the waters are drained without a reasonable need to do so, or are willfully or negligently wasted in such operation in a way and manner as that it should have been anticipated to occur, and as a proximate result the damage accrued to the surface owners so affected, * * * there is an actionable claim * * *."

■ We may add, there being no proof to the contrary, the well was presumably from percolating water. Stracner case, supra.

■ Upon this question of failure to exercise due care on the part of the mine operator, the plaintiff, as is not unusual in such cases, necessarily relied upon circumstantial evidence. The sufficiency of the proof in matters of this character often presents much difficulty. But a careful study of the evidence in this case, somewhat voluminous, leads us to the conclusion that the trial court correctly ruled in submitting the issues of fact to the jury. No detailed discussion of these facts will be here undertaken. A very general outline will suffice.

On July 1, 1942, appellant's well, with an ample—and indeed an unusual—supply of water, showed a muddy condition, and three days thereafter was entirely dry. It has supplied no water since that date. Defendant had mined under plaintiff's land in what is known as "5th and 6th left" but in fact there had been no work immediately under this land since 1935 or 1936. Plaintiff's testimony, however, tends to show that the stoppage of this work was due to a falling roof and a "squeeze." As a witness explained it: "When there is a squeeze, that means the roof is coming down." Plaintiff further testified, on account of this condition they could not go into the 5th or 6th any distance; that he had been working there as a materialman "pulling material right behind as they came out of there." What the witness refers to as a squeeze will crush the pillars in a mine; and a squeeze is caused by leaving insufficient pillars. Squeezes will cause cracks, and it takes a large area of falls to cause cracks to the surface 480 feet above.

One Mumpower had property just across the road from that of the plaintiff, and cracks occurred on his place in 1941, 1942, and 1943. These cracks on the Mumpower property were produced by the defendant's operations, the cracks being 12 to 24 inches in width at the top. The evidence further indicated that the cracks were caused by "robbing" and removing the coal, which let the roof fall. Mumpower's testimony indicates that these cracks appeared in the surface of his land in 1942 and at about the time plaintiff's well went dry. While these cracks were some 300 feet from plaintiff's land, yet the testimony shows that two wells beyond plaintiff, and farther from Mumpower, also went dry. While what was referred to as the squeeze in 5th and 6th of the mine may have occurred some six or seven years prior to the loss of plaintiff's well, yet plaintiff's testimony tends to show that the squeeze continued; and when once started, cannot be stopped. It is caused from taking too much coal out of certain places. As stated, "they pulled the pillars in the wrong place."

Plaintiff was in the employ of the defendant, with many years of mining experience. Plaintiff testified in regard to the squeeze that "it never does quit. It has not quit yet." And causes surface breaks to the top.

We find from a study of the record that there was evidence tending to show what is called "robbing" the coal from under the Mumpower land, which was adjacent to that of the plaintiff, caused these large cracks on the surface in 1942 when plaintiff's well suddenly went dry. There was evidence tending to show that the mining operation under plaintiff's land could not be extended to robbing operations for the reason that the workmen were run out due to the squeeze; that the squeeze did break the strata and continued for several years thereafter, caused by robbing pillars in adjacent operations, and that a squeeze once started is hard to stop. Plaintiff's testimony in this respect finds some corroboration in some of the testimony of defendant's expert witnesses.

True, defendant offered much proof tending to show that the roof of the mine under plaintiff's land was in good condition, and that the mining operations were prudently conducted, and that no injury

could have been anticipated from the manner in which defendant operated this mine. All of this evidence has been read with much care. Its further discussion here would extend this opinion to undue length and serve no useful purpose. Suffice it to say that we have reached the conclusion a jury question was presented, and the affirmative charge properly refused.

Nor, are we of the opinion the verdict of the jury was so contrary to the great preponderance of the evidence as to justify our disturbance of the trial court's ruling in denying the motion for a new trial upon this ground.

■ The question (63rd assignment of error) asked the witness Hogan on redirect examination concerning his well going dry (which was some 200 yards from the well of this plaintiff) was never answered. The objection to the question was sustained. True, the question was as to whether or not the defendant settled with the witness when his well went dry. Very litle more was said other than the objection being interposed and the court sustaining the objection, stating he didn't consider the matter competent. There was no request for further instruction as to the impropriety of such a question, and we think it quite clear that under the record as here presented, this Court would not be justified in disturbing the trial court's ruling in denying a new trial based merely upon the foregoing question.

``` Some assignments of error relate to improper argument of counsel for the plaintiff, to which no objection was interposed and no ruling, therefore, based thereon. Counsel for defendant insist that the argument was of so highly prejudicial a character as to be ineradicable and to justify the granting of a new trial, though no objection was interposed; citing Birmingham Ry., Light & Power Co. v. Gonzalez, 183 Ala. 273, 61 So. 80, Ann.Cas.1916A, 543; Jackson Lumber Co. v. Trammell, 199 Ala. 536, 74 So. 469; Watts v. Espy, 211 Ala. 502, 101 So. 106; Metropolitan Life Ins. Co. v. Carter, 212 Ala. 212, 102 So. 130. Whatever may be said concerning the argument advanced or the merits of these assignments of error, we are of the opinion the question is not here presented for consideration.

■ A mere recital of the alleged argument in a motion for a new trial, with nothing to give verity thereto, is insufficient as disclosing what in fact did occur on the trial. As said in Taylor v. Corley, 113 Ala. 580, 21 So. 404, 405: "The fact that the motion, which is incorporated in the bill of exceptions, assumes or even alleges that the court excluded certain evidence, or gave or refused this charge or that, does not show, for any purpose, that the court so ruled or acted. Error therefore cannot be affirmed of the court's denial of the motion for a new trial."

And in the more recent case of Busenlchner v. Parsons, 226 Ala. 548, 147 So. 633, 634, the Court observed: "It would hardly seem necessary to say that mere recitals of evidence and rulings thereon in a motion for a new trial, with nothing to give verity to such recitals, cannot be made a substitute for a properly certified bill of exceptions showing what did occur on the trial."

Since we have now abolished bills of exceptions, it was incumbent upon the defendant to offer proof on the motion concerning this matter of alleged illegal argument, which would have then become a part of the record and here presented for consideration. In the absence of any such showing, there is nothing here for review.

The remaining question relates to the ground of the motion for a new trial that the verdict is excessive. Unlike the situation presented in Republic Steel Corp. v. Stracner, supra, the evidence upon this question was in rather sharp dispute. Upon the trial plaintiff fixed a valuation of $2500 upon the six room house situated upon this half acre of land, and insisted that it was without value so long as the well was dry. There was ample proof that a well could be dug for some few hundred dollars; and one engaged in that business gave it as his opinion that in all probability water could be found at a reasonable distance.

We attach little importance to the fact there was a spring within reasonable distance from plaintiff's property, and not too great importance to the fact that in the years 1941 and 1942 the gross valuation for assessment purposes was given in by plaintiff at $420, and at a gross valuation of $900 for the years 1943 and 1944, after the well went dry. But we are impressed with the admission of the plaintiff, upon cross-examination, that in answering the interrogatories propounded by the defendant, he had stated his property was worth $2250 before the well went dry, and that it was worth $1500 after this occurrence.

560

One of the witnesses who was acquainted with that character of work stated that a cistern could be built upon the property for $1,000 or $1250. The great difference in values, as well as the amount of loss suffered, as given by the plaintiff before the trial and during the trial, cannot but make a very positive impression upon an impartial judicial mind. The duty devolving upon this Court in matters of this character, as set out in Title 7, Sec. 811, Code 1940, is a delicate one and to be exercised with caution.

Upon a careful review of the entire record we are persuaded that any damages in excess of $1200 are excessive. A judgment will accordingly be here entered, that unless appellee files a remittitur as provided by law with the Clerk of this Court within thirty days reducing the judgment to $1200, the judgment of the trial court will stand reversed. If, however, such remittitur is duly filed, a judgment for $1,200, with interest from May 28, 1945, the date of the judgment, will stand affirmed. The 10% penalty is not to be assessed, and under such an order the appellee is taxed with the costs of the appeal. The costs as taxed against the defendant in the court below will, of course, stand. Louisville & N. R. Co. v. Grizzard, 238 Ala. 49, 189 So. 203.

The judgment will, therefore, be affirmed conditionally as above indicated.

Affirmed conditionally.

BROWN, LIVINGSTON, and SIMPSON, JJ., concur.